**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 22-CR-123 (KMW) |
| | : | |
| v. | : | Hon. Karen M. Williams |
| | : | |
| BOLAJI BOLARINWA and | : | |
| ISIAKA BOLARINWA | : | |

<u>**GOVERNMENT'S OPPOSITION TO DEFENDANT ISIAKA BOLARINWA'S**
**RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**</u>

COMES NOW the United States of America, by and through its attorneys, Philip R. Sellinger, United States Attorney for the District of New Jersey (Jeffrey B. Bender, Assistant United States Attorney, appearing) and Kristen Clarke, Assistant Attorney General (Elizabeth Hutson, Trial Attorney, appearing) and submits this response to Defendant Isiaka Bolarinwa's Motion for Judgment of Acquittal Pursuant to Rule 29. ECF 103. Respectfully, for the reasons stated below, this Court should deny the Defendant's motion.

## I.    PROCEDURAL BACKGROUND

On February 16, 2022, a Grand Jury in the District of New Jersey returned an eight-count Indictment charging Defendant Isiaka Bolarinwa with two counts of Forced Labor in violation of 18 U.S.C. § 1589(b) (Counts III and IV). ECF 1. The Indictment also charged Defendant Bolaji Bolarinwa with two counts of Forced Labor in violation of 18 U.S.C. § 1589(a) (Counts I and II); two counts of Bringing in and Harboring Certain Aliens For Financial Gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (B)(i) (Counts V and VI); and two counts of Unlawful Conduct with Respect to Documents in Furtherance of Forced Labor in violation of 18 U.S.C. § 1592 (Counts VII and VIII). ECF 1. Defendants both pleaded not guilty on February 17, 2022. ECF 6, 11. On December 6, 2023, a Grand Jury in the District of New Jersey returned a Superseding Indictment that added Isiaka Bolarinwa as a defendant to Count Five and Count Six, the two counts of

Bringing in and Harboring Certain Aliens for Financial Gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (B)(i). ECF 50.

On April 17, 2024, after the government closed its evidence, both Defendants made oral motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. This Court denied the motion by Defendant Bolaji Bolarinwa as to all counts.  This Court reserved judgment on the motion by Defendant Isiaka Bolarinwa.[1]

On April 24, 2024, after a two-week trial, a jury convicted Defendant Isiaka Bolarinwa of two counts of Forced Labor (Counts III and IV) and one count of Bringing in and Harboring Certain Aliens for Financial Gain (Count V). The jury also convicted Defendant Bolaji Bolarinwa of two counts of Forced Labor (Counts I and II); one Count of Bringing in and Harboring Certain Aliens for Financial Gain (Count V); and two counts of Unlawful Conduct with Respect to Documents in Furtherance of Forced Labor in violation of 18 U.S.C. § 1592 (Counts VII and VIII). The jury acquitted both Defendants of the second count of Bringing in and Harboring Certain Aliens for Financial Gain (Count VI).

Counsel for Defendant Isiaka Bolarinwa filed the instant motion on May 7, 2024.[2] A hearing is set for May 17, 2024.

---

[1] Because the Court reserved ruling on Defendant Isiaka Bolarinwa's motion made after the government's case, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved." *See* Fed. R. Crim. P. 29(b); *United States v. Brodie*, 403 F.3d 123, 133–34 (3d Cir. 2005) (same).

[2] Counsel for Defendant Bolaji Bolarinwa filed a motion on May 8, 2024, joining Defendant Isiaka Bolarinwa's motion. ECF 104 at 2. The government will respond in a separate opposition to that motion.

## II.    LEGAL AUTHORITY AND ARGUMENT

### A.    Legal Standard Governing Defendant's Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29(c)

After the jury renders a verdict and is discharged, a "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days." FED. R. CRIM. P. 29(c). Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). In ruling on a Rule 29 motion, a court must view the evidence in the light most favorable to the prosecution. *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001). The government receives "the benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 738 F.3d 614, 618 (3d Cir. 1986). Credibility conflicts, too, are to be resolved in the government's favor. *United States v. Scanzello*, 822 F.2d 18, 21 (3d Cir. 1987).

When ruling on a motion for judgment of acquittal made pursuant to Rule 29, a district court may grant the motion only if, after reviewing the record "'in a light most favorable to the prosecution,'" the court determines that "'no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" *United States v. Tyler*, 956 F.3d 116, 122 (3d Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Rule 29 standard is highly deferential, and a court's review under this standard is limited to consideration only of the sufficiency of the evidence admitted at trial. *See United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005); *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014); *United States v. Duvergel*, 629 F. Supp. 246 (D.N.J. 2022) ("The district court must view the evidence in its entirety and in the light most favorable to the government[.]"). In reviewing a motion for acquittal, the court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and

3

assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). Accordingly, district courts are only permitted to grant a judgment of acquittal in "cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002). The "evidence need not unequivocally point to the defendant's guilt [to overcome a Rule 29 motion] as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990). In the sections that follow, the government will demonstrate that the evidence presented at trial permitted the jury to find Defendant Isiaka Bolarinwa guilty of Counts III, IV, and V.

**B.  Counts Three and Four: Forced Labor (18 U.S.C. § 1589)**

This Court should decline to disturb the jury's verdict with respect to Counts Three and Four because the evidence taken in the light most favorable to the government permits the jury finding the Defendant guilty beyond a reasonable doubt.

To obtain a conviction for these offenses, the government must prove the following three elements beyond a reasonable doubt: (1) Defendant Isiaka Bolarinwa knowingly benefitted or received anything of value from participation in a venture which provided or obtained the labor or services of Victim 1 or Victim 2;[3] (2) the venture provided or obtained the labor or services of Victim 1 or Victim 2 through at least one of the prohibited means described in 18 U.S.C. § 1589(a); and (3) Defendant Isiaka Bolarinwa knew or recklessly disregarded the fact that the venture engaged in providing or obtaining the labor or services of Victim 1 or Victim 2 by at least one of the prohibited means. 18 U.S.C. §§ 1589(a) and (b). Notably, contrary to what Defendant Isiaka Bolarinwa suggests in his Motion, ECF 103, the government need ***not*** prove that Defendant Isiaka

---

[3] Victim 1 is Bunmi; Victim 2 is Titi.

Bolarinwa himself engaged in any of the four prohibited means described in 18 U.S.C. § 1589(a) – **only that** the venture engaged in such conduct and that he knew of that conduct—or recklessly disregarded the fact the venture was engaged in such conduct—and he knowingly received something of value by participating in the venture.

### 1. First Element: Participation in, and Benefit from Participation in, a Venture

To satisfy this element, the government must prove that Defendant Isiaka Bolarinwa knowingly benefitted or received anything of value from participation in a venture which provided or obtained the labor or services of Victim 1 or Victim 2.

i.    <u>Labor or Services</u>

The words "provide," "obtain," "labor," and "services" are not defined by statute and maintain their ordinary, everyday meaning. *Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). The defense suggests that the definition of "labor and services" should not extend to domestic labor. ECF 103 at 7 (emphasizing "house chores"), 11 (describing Victim 2's duties around the house as "chores"). This argument is factually and legally incorrect.

Federal courts have broadly defined the term "labor or services" to include any physical or mental exertion performed for the benefit of another person. *See United States v. Kaufman*, 546 F.3d 1242, 1260-63 (10th Cir. 2008) (finding no plain error with a jury instruction defining labor as "the expenditure of physical or mental effort"). Consistent with their plain meaning, the terms "labor" and "services" encompass a wide array of work, including household chores and domestic services. *See United States v. Toure*, 965 F.3d 393, 402 (5th Cir. 2020) (affirming forced labor convictions where the defendants compelled a young woman living in their home to cook, clean, and perform other household chores); *United States v.*

*Callahan*, 801 F.3d 606, 620 (6th Cir. 2015) (finding that household services including cooking and cleaning constitute "labor or services" under Section 1589); *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (rejecting defendant's argument that Section 1589 does not apply to "unpaid domestic chores"); *United States v. Hunaity*, 851 F. App'x 312 (3d Cir. 2021) (affirming Section 1589 conviction where victim performed household chores and childcare, without directly addressing the definition of "labor or services"); *United States v. Barai*, 55 F.4th 1245 (9th Cir. 2022) (affirming Section 1589 convictions where victims performed childcare services as live-in nannies, without directly addressing the definition of "labor or services"); *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) (affirming Section 1589 conviction where victim performed domestic chores and childcare services as a live-in housekeeper, without directly addressing definition of "labor or services"); *United States v. Nnaji*, 447 F. App'x 558 (5th Cir. 2011) (affirming forced labor, alien harboring, and conspiracy convictions where the victim was a live-in nanny who "attended to all of the household chores" and was the caregiver for defendants' children, without directly addressing the definition of "labor or services"); *United States v. Aman*, No. 19-CR-85, 2022 WL 3371320, at *6-7 (E.D. Va. Aug. 16, 2022) (finding that "'labor or services' under the forced labor statute can include household chores" where victim's domestic work included cleaning entire home and preparing meals every day); *see also* H.R. Conf. Rep. 106-939, 106th Cong. (Oct. 5, 2000) (memorializing Congress's intent to apply Section 1589 to "cases in which individuals have been trafficked into domestic service, an increasingly common occurrence"). Therefore, the Victims' work inside the Defendants' home constitutes "labor or services" under Section 1589.

The evidence at trial showed the labor or services that Victims 1 and 2 provided included cleaning the home, cooking for members of the family, and providing childcare for the Defendants'

two youngest children. Trial Transcript (hereinafter, "Tr.") 240:20-241:21 (Victim 1 testified that she took care of the baby, did the laundry, performed sweeping and mopping, and washed the toilets); 264:16-24 (Victim 1 testified that she cooked rice, beans, and food for the two youngest children); 525:16-526:1 (Jessica St. Petery observed Victim 1 cooking and cleaning the floors and testified that there was never a time that she saw Victim 1 in the Bolarinwa home when she was *not* working); 661:12-22, 725:15-726:4 (Agent Addison described Victim 1's work in the Bolarinwa home); 622:10-20 (Victim 2 testified that she cleaned the children's bathrooms, vacuumed the home, and took care of the Defendants' son); 623:14-19 (Victim 2 testified that she and Victim 1 shared cleaning responsibilities); 625:10-15 (Victim 2 testified that she cleaned the kids' bathrooms and rooms); 628:8-629:4 (Victim 2 testified that cleaning was a daily responsibility for Victim 1 and Victim 2). Indeed, Defendant's Motion for Acquittal concedes that Victim 1's "role was to clean the house, do laundry, and care for the Bolarinwa's youngest child," ECF 103 at 3, and that Victim 2 was responsible for caring for the Bolarinwa's son, along with various household chores. ECF 103 at 7.

The Victims did not provide this labor and these services in a way that a typical houseguest might make their bed, clean the bathroom after use, or offer to cook a meal for their host. Tr. 243:1-12 (Victim 1 did not think about asking for any breaks during the day because she didn't want to be cursed out by Defendant Bolaji Bolarinwa); 629:7-18 (Victim 2 did not feel like she could refuse to do cleaning or other chores because she was too scared of Defendant Bolaji Bolarinwa and what would happen if she said "no"); 756:7-19 (Victim 2 was not "taken as one of the kids" but instead "was more like an outsider that came there to live there and work"). Instead, the evidence showed that Defendants Isiaka and Bolaji Bolarinwa made the Victims clean the entirety of the house every day, and care for their children, including sleeping in the same room as their

developmentally disabled son so as to be in a position to calm him during the night. Tr. 242:2-23 (Victim 1 testified that she worked from 5 a.m. until 10 p.m. and did not have any breaks during the day); 619:15-620:16 (Victim 2 testified that she slept in the Defendants' son's room because she was responsible for him); 635:7-16 (Victim 2's responsibilities for the Defendants' son included sleeping in his room in case he wakes up in the middle of the night). The Victims were not expecting to perform all this work before they arrived in the United States. Tr. 241:21-242:1; 621:1-622:9; 687:6-19; 756:7-19. Moreover, unlike a houseguest, the Defendants did not intend for the Victims to ever leave their employ, as evidenced from Victim 1 overstaying her visa and Defendant Bolaji Bolarinwa possessing Victim 1's passport, and telling Victim 1's daughter, "she's not going anywhere." Exhibit 110 at timestamp 10:24.

ii.      Familial Relationship Does Not Negate Culpability

Throughout trial and in his Motion for Judgment of Acquittal, Defendant suggests that Victim 2's relationship to the Bolarinwa family as his niece somehow shields him (and his wife) from culpability. ECF 103 at 11. This argument is not supported by the law. There is nothing in the plain language of the statute that excludes or immunizes family members from prosecution under Section 1589. *See* 18 U.S.C. § 1589 (penalizing the use of a prohibited means to compel the labor or services of "a person" without further qualification or limitation); *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014) (noting that "the forced labor statute contains no exception for parents or other close relatives").

Based on the unambiguously broad language of Section 1589 and its legislative history, federal courts have consistently applied Section 1589 to a myriad of defendant-victim relationships. The defendant in *United States v. Marcus*, for example, challenged the application of the statute to domestic and intimate relationships, asserting that the construction of "labor or

8

services" was ambiguous in the context of an intimate relationship and that the victim volunteered her services in a way that a spouse or partner performs domestic chores. 487 F. Supp. 2d 289, 300 (E.D.N.Y. 2007). In denying the defendant's motion for judgment of acquittal, the district court held that "the TVPA's legislative history reveals no expressed intention to preclude criminal liability in those contexts." *Id.* at 304. Relying on *Smith v. United States*, 508 U.S. 223 (1998), the district court further noted that if Congress had intended to narrowly construct the statute to exclude certain types of relationships, it would have explicitly done so. *Id*.

The Sixth Circuit reached a similar conclusion in *United States v. Callahan* while upholding a forced labor conviction against a defendant who compelled his roommate to perform household chores. 801 F.3d at 606. The court reasoned that because "Congress imposed limitations on . . . the category of victims" in the child sex trafficking statute, "the unqualified term 'a person'" as used in the first element of Section 1589 "is purposefully broad." *Id.* at 617.

Apart from this case, the most recent federal prosecution for committing the crime of forced labor against a family member took place this past January in a case with similar facts to the instant case, where husband-and-wife defendants recruited their 17-year-old nephew from India by making promises to him and his parents that he could attend college in the United States. *United States v. Kaur, et al*, No. 23-CR-92 (E.D. Va. Jan. 19, 2024). When the victim arrived, the defendants compelled his labor through prohibited means, and the victim overstayed his visa. *Id.* The jury in the Eastern District of Virginia convicted the husband-and-wife defendants for forced labor under Section 1589. *Id.*

In another forced labor case arising in the Eastern District of Virginia in 2019, that court specifically held that the forced labor statute ***does*** permit the prosecution of family members. *Aman*, 2022 WL 3371320, at *6-7. There, the defendants, who were the mother-in-law and

brothers-in-law of the victim, conspired to obtain and maintain the unpaid labor and services of the victim. *Id.* at *1. To compel the victim to do work for them at their home, the defendants physically abused the victim and used threats related to the victim's immigration documents. *Id.* A jury found the defendants guilty of conspiracy to commit forced labor and forced labor. *Id.* After the guilty verdicts, the defendants renewed their motion for judgement of acquittal, arguing, in part, that the forced labor statute does not apply to familial situations, and therefore their convictions could not stand. *Id.* The court disagreed. Regarding the defendants' argument that the forced labor statute does not permit the prosecution of family members during a shared living arrangement, the court reasoned that the forced labor statute contains no language that suggests Congress did not intend for the statute to apply to familial situations. *Id.* at *7. The court further explained: "Absent ambiguity in the statutory text, '[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the statutory] language.'" *Id.* (citing *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010) (alterations in original) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)). Finally, the court recognized that "<u>this situation is precisely what the forced labor statute seeks to reach</u>," and, therefore, held that the defendants were properly prosecuted pursuant to the forced labor statute. *Id.* (emphasis provided).

Here, Defendant's argument in this regard is that this case is controlled by the outcome of *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014). ECF 103 at 12. In *Toviave* ( a Sixth Circuit case from 2014) the defendant was prosecuted under Section 1589 after he brought four young relatives from Togo to live with him in Michigan, and made them clean, cook, do laundry, and babysit. *Id.* The defendant in *Toviave* was not the biological father of the four children but rather

was standing in loco parentis.[4] *Id.* Although the defendant would beat the children if they misbehaved or failed to follow one of his rules, he was not always cruel to the children—he bought the kids sports equipment and allowed them to participate in recreational activities; they went on family vacations together; and he emphasized their education by hiring an English tutor, imposing mandatory study periods, and creating extra assignments and academic drills for the children to complete when their homework was finished. *Id.* The Sixth Circuit reversed the defendant's conviction, holding that though the defendant's physical abusive behavior was reprehensible, it was not forced labor. *Id.* The Sixth Circuit explained that, within the parent-child relationship, "treating household chores and required homework as forced labor because that conduct was enforced by abuse either turns the forced labor statute into a federal child abuse statute or renders the requirement of household chores a federal crime." *Id.* at 625. Notably, nothing in *Toviave* (or other case law examining forced labor crimes) suggests a *per se* rule that a relative cannot commit labor trafficking.

Defendant Isiaka Bolarinwa appears to argue that he was Victim 2's *de facto* guardian with parental rights, and was acting within his parental rights, insofar as the holding in *Toviave* is limited to parent-child relationships, in recognition of the unique rights parents enjoy with respect to directing their children to perform ordinary household chores. *Toviave* notes that "it has always been true that parents can make their children perform [household chores]" and "the forced labor

---

[4] Defendant Isiaka Bolarinwa claims the government "misread the familial relationships" in *Toviave* in its Trial Brief. ECF 103 at 12. To the contrary, the government cited *Toviave* in its Trial Brief for the proposition that the only relationship excluded from the federal forced labor statute is that of a parent and child, but only when the parent merely requires their child to perform ordinary household chores. *See United States v. Toviave*, 761 F.3d 623, 630 (6th Cir. 2014) (noting that "it has always been true that parents can make their children perform [household chores]" and "the forced labor statute could not have been intended to overturn this longstanding parental right" as long as the labor does not exceed basic work around the home)." ECF 67 at 16.

statute could not have been intended to overturn this longstanding parental right" as long as the labor does not exceed basic work around the home). 761 F.3d at 630.

Defendant supports this argument by claiming that "[t]here is absolutely no distinction between the conduct in *Toviave* and the case at bar, with the exception that Dr. Bolarinwa only slapped Titi one time." ECF 103 at 12.[5] However, this case differs from *Toviave* in several important respects: (1) Defendants are not Victim 2's parents or guardians; (2) Victim 2 was an adult; and (3) *Toviave*'s intent in forcing his children to do work in the home was to raise disciplined, responsible children, while Defendants Bolaji and Isiaka Bolarinwa forced Victim 2 to labor in their home because they sought to obtain domestic employees to necessary domestic help and childcare for low to no cost. Unlike *Toviave*, Defendant's conduct was more than "requiring one's children to do their homework, babysit on occasion, and do household chores." *Id.* at 624; *see supra*. In *Toviave*, the analysis turned on Toviave being strict, but still parentally-focused—the court viewed Toviave's crimes as child abuse committed by a guardian, to be prosecuted by the state. Here, the evidence indicates that Defendants Bolaji and Isiaka Bolarinwa did not treat Victim 2 as they did their own children, but in fact, made her care for their children as would a professional caregiver.

In short, although Victim 2 is the niece of Defendant Isiaka Bolarinwa, she was not a child in his care and he was not responsible for raising her to adulthood. And Defendants were not entitled to compel Victim 2's labor or services in their home using statutorily prohibited means to do so. *See Marcus*, 487 F. Supp. 2d at 299 (finding that the plain language and legislative history of Section 1589 "reveals no expressed intention to preclude criminal liability in [the] context[] of

---

[5] Although he concedes this point in his Motion, ECF 103 at 7 and 12, Defendant denied that he ever hit Victim 2 – or anyone else – in his entire life. Tr. 1079:22-1080:1.

"intimate relationships" and "[h]ad Congress intended the narrow construction [the defendant] urges, it could have so indicated") (quoting *Smith v. United States*, 508 U.S. 223, 229 (1993)); *United States v. Walsh*, No. 19-cr-38 (E.D. Ky. June 28, 2019) (defendant was the half-brother of one victim).

### iii.    Participation in a Venture

The next determination for this first element is whether the Defendant participated in a venture under Section 1589. While Section 1589 does not define "venture," the analogous provision under the sex trafficking statute also found in Chapter 77—18 U.S.C. § 1591-- defines a "venture" as a "group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6); *Ricchio v. McLean*, 853 F.3d 553, 557 (1st Cir. 2017).[6] This is the definition this Court instructed the jury to use at trial. Tr. 1172:25-1173:5.

The Supreme Court has defined the phrase "associated in fact," albeit in a different context, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Importantly, the venture (or the "association in fact" engaging in a "course of conduct") need not be illegal. In this regard, a venture is not necessarily a conspiracy (although it can be), nor is necessarily a principal-accomplice relationship (although it can be). In this case, the "venture" (or the "association in fact" engaging in a "course of conduct") is the marriage relationship between the two Defendants, and their conduct of living jointly, raising children, and budgeting household duties and expenses. That is to say, marriage (and its associated duties and responsibilities) is the venture in which Defendant

---

[6] These statutes (18 U.S.C. § 1589 prohibiting forced labor and 18 U.S.C. § 1591 prohibiting sex trafficking) were enacted together as part of the Trafficking Victims Protection Act of 2000 and they share many definitions, including coercion and serious harm. Therefore, the most logical definition of venture, absent a statutory definition provided within Section 1589, is the statutory definition provided in Section 1591.

Isiaka Bolarinwa participated. *See Fuentes v. Fuentes,* 247 F. Supp. 2d 714, 717 (D.V.I. 2003) (marriage is a partnership, or joint venture, whereby both parties collaborate for a common purpose and contribute toward its success).

The evidence presented to the jury at trial established that the Defendants were married, lived in the same home where they raised their four children, and filed joint tax returns. Tr. 618 (Victim 2 explaining that the people who lived in the Defendants' household in 2016 were the Defendants, their children, and Victim 1); 633 (Victim 2 explaining that Bolaji Bolarinwa is Isiaka Bolarinwa's wife); Exhibit 300 and Exhibit 360 at 31 (Joint Tax Returns).

### iv.    Knowingly Benefitted Financially or Received Anything of Value

The next determination of the first element is whether Defendant Isiaka Bolarinwa knowingly benefitted financially or received "anything of value" from his participation in the venture. *See* 18 U.S.C. § 1589(b). The phrase "anything of value" under both Sections 1589(b) and 1591(a)(2) is interpreted broadly, to include both tangible goods and intangible acts or services. *See Ricchio*, 853 F.3d at 556 (citing *United States v. Cook*, 782 F.3d 983 (8th Cir. 2015) ("The phrase 'anything of value' is extremely broad")). A benefit can be any profit, advantage, thing of value in any form, no matter how minor, because of the beneficiary's participation in the venture. *United States v. Flanders*, 752 F.3d 1317, 1325-32, 1337-38 (11th Cir. 2014) (emphasis provided); *see also United States v. Jennings*, 280 F. App'x 836, 844 (11th Cir. 2008) (finding sufficient evidence that the defendant "benefitted financially" from participating in a venture by having his gas and room paid for through by proceeds of the illegal trafficking); *United States v. Wild*, 143 F. App'x 938, 943 (10th Cir. 2005) (finding that there was sufficient evidence that the defendant "financially profited" from participation in a venture by receiving cash proceeds of the illegal trafficking). Courts have found that value is a subjective concept and the value of the

tangible goods or intangible services is whatever value the defendant attaches to it. *See United States v. Petrovic*, 701 F.3d 849, 858 (8th Cir.2012) (explaining the broad and subjective interpretation of the term "thing of value" under the interstate extortionate threat statute).

Here, the evidence has shown that Defendant Isiaka Bolarinwa participated in a venture (*i.e.*, the marriage and its associated duties and responsibilities) and benefitted from his participation in the venture because he received the services provided by Victims 1 and 2 in the form of housekeeping, cooking, and childcare. Tr. 240:20-241:21 (Victim 1 testified that she took care of the baby, did the laundry, performed sweeping and mopping, and washed the toilets in Defendant Isiaka Bolarinwa's home); 264:20-21 (Victim 1 testified that she made food for Defendant Isiaka Bolarinwa's two younger children); 271:7-16 (Victim 1 testified that Defendant Isiaka Bolarinwa stayed in the home when Defendant Bolaji Bolarinwa traveled to Nigeria in April 2016 and that she had to continue working during the time she was gone); 281:21-282:2 (Victim 1 testified that she cleaned the living room, where Defendant Isiaka Bolarinwa would watch television); 282:15-22 (Victim 1 testified that she Defendant Isiaka Bolarinwa never gave her a break, vacation, or day off from work); 622:10-20 (Victim 2 testified that she cleaned the kids' bathrooms, vacuumed the home, and took care of the Defendants' severely autistic son); 623:14-19 (Victim 2 testified that she and Victim 1 shared cleaning responsibilities).

Further, Defendant Isiaka Bolarinwa did not just benefit from having such services provided in his home; he benefitted financially because he received these services at a significant cost savings than had he legally hired employees to perform such services. Tr. 421:21-422:1 (Victim 1 testified that she was paid approximately $2,250 for the entire time she worked in the Bolarinwa home); 620:8-25 (Stipulation that from December 2015 until October 2016, the minimum wage rate in Moorestown, New Jersey, was $8.38 per hour); 622:7-626:16 (Agent

Addison testified about the wages due to Victim 1 and Victim 2 using the minimum wage rate and various hours worked per day); 681:9-11 (Defendants never paid Victim 2 for working in the household); Exhibit 300 (2016 Form 1040 Individual Tax Return for Defendants Isiaka and Bolaji Bolarinwa showing childcare tax credit). The evidence has shown that Defendant Isiaka Bolarinwa knew that he received these benefits. Tr. 344-345 (Victim 1 described how Isiaka Bolarinwa was supposed to be bathing his son, and did so for "some time," before Victim 1 resumed bathing the Defendants' son). Further, he knew about previous au pairs hired in the Bolarinwa home and knew Victim 1 and Victim 2 were coming to live with the family without an au pair. Tr. 642:5-8 (Victim 2 described that sometimes Isiaka Bolarinwa would ask his oldest daughter to assist Victim 2 with the Defendant's son's care); 628:20-25 (Agent Addison's testimony that Defendant Bolaji Bolarinwa admitted to having au pairs in the past).

Although Defendant Isiaka Bolarinwa worked long hours and was not at home as frequently as his wife, he lived in the home full-time and was present on weekends and on weekdays before he left for work and after he came home from work in the evenings. Tr. 279:13-280:4 (Victim 1 testified that Defendant Isiaka Bolarinwa lived in the home and left for work around 8 a.m.); 281:21-25 (Victim 1 testified that Defendant Isiaka Bolarinwa would watch TV in the living room of the home); 398:20-399:1 (Victim 1 clarified that sometimes Defendant Isiaka Bolarinwa would come home in the afternoon from work). While living in the home, Defendant Isiaka Bolarinwa knew that two other persons were also living in the home and providing domestic labor and services. It can be inferred that he knew he was not the person cleaning the home or cooking the meals or watching the children, nor was his wife. Defendant Isiaka Bolarinwa also had conversations with Victim 2 about her work and treatment in the home. Tr. 656:19-657:19 (Defendant Isiaka Bolarinwa told Victim 2 if she wanted to succeed in life she would have to "take

everything that is going on" and "overcome" the "obstacle" of being treated poorly by Defendant Bolaji Bolarinwa).

Moreover, Defendant Isiaka Bolarinwa observed Bolaji beating Victim 2 on at least one occasion. ECF 103 at 7 ("Dr. Bolarinwa made Mrs. Bolarinwa stop hitting Titi when Mrs. Bolarinwa hit Tit with an 'African broom.'"); Tr. 643:2-24 (Victim 2 testifying about how Defendant Isiaka Bolarinwa came downstairs and told Defendant Bolaji Bolarinwa to stop after he saw Bolaji Bolarinwa beating Victim 2 with a broom). And Defendant Isiaka Bolarinwa spoke to Victim 2's parents about Victim 2's behavior in the home. Tr. 741:21-742:10 (Victim 2 testified about her conversation with her parents after Defendants Isiaka and Bolaji Bolarinwa spoke with them). Therefore, the evidence shows that Defendant Isiaka Bolarinwa knowingly benefitted financially or received "anything of value" from his participation in the venture.

### 2. Second Element: The Venture Provided or Obtained the Labor or Services by Prohibited Means

Second, the government must prove that the venture provided or obtained the labor or services by prohibited means. Throughout his Motion, Defendant places great emphasis on what Defendant Bolaji Bolarinwa did and said regarding Victim 1 and Victim 2, as compared to Defendant Isiaka Bolarinwa. ECF 103. However, the government need ***not*** prove that ***Defendant Isiaka Bolarinwa*** provided or obtained the labor or services by prohibited means; only that the ***venture*** provided or obtained the labor or services by prohibited means. In this case, the evidence has shown that Defendant Bolaji Bolarinwa was also a member of the venture, and that she—to the benefit of the venture—obtained  the labor or services of Victim 1 or 2 by a prohibited means, specifically through (1) the use of force, threats of force, physical restraint, or threats of physical restraint to Victim 2; (2) serious harm or threats of serious harm to Victim 1, Victim 2, or another person; (3) the abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern

intended to cause Victim 1 or Victim 2 to believe that, if Victim 1 or Victim 2 did not perform such labor or services, they or another person would suffer serious harm or physical restraint. Tr. 274:16-278:10 (Victim 1 testified about how she couldn't leave the home because she didn't have her passport, didn't have a ticket, didn't have enough money, and believed that Defendant Bolaji Bolarinwa could kill her and her daughter); 287:11-289:24 (Victim 1 described Defendant Bolaji Bolarinwa beating Victim 2 with a broom and an electrical cord); 312:1-10 (Victim 1 described how she could not use her voice, talk, or move around in the Bolarinwa home); 624:13-24 (Victim 2 described limitations on when and what she could eat by Defendant Bolaji Bolarinwa); 627:9-15 (Victim 2 testified about how Defendant Bolaji Bolarinwa would watch her movements inside the home through installed cameras); 629:7-630:6 (Victim 2 testified about her fear of Defendant Bolaji Bolarinwa and described how she "got the beating of [her] life"); 630:13-631:12 (Victim 2 testifying about the first beating by Defendant Bolaji Bolarinwa); 649:25-650:10 (Victim 2 described how Defendant Isiaka Bolarinwa slapped her); 651:1-18 (Victim 2 described how Defendant Bolaji Bolarinwa threated her and her family with juju and black magic); 652:15-23 (Victim 2 described how Defendant Bolaji Bolarinwa would threaten to slap her); 654:2-8 (Victim 2 testified about how Defendant Bolaji Bolarinwa's words made her feel like she is "nobody" and "doesn't deserve to be here"); 655:14-656:14 (Victim 2 testified about how Defendants Isiaka and Bolaji Bolarinwa threatened to send her back to Nigeria); 716:2-13 (Agent Addison testified about how Victim 2 told him that she was the victim of physical abuse at the hands of the Defendants and that Victim 1 personally observed at least some of the physical abuse of Victim 2); 717:10-22 (Agent Addison described how Professor Syreeta Washington and Jessica St. Petery observed the effects of physical abuse on Victim 2). Indeed, this Court found the evidence to be sufficient to find Defendant Bolaji Bolarinwa guilty of Counts I and II when it denied Defendant Bolaji

Bolarinwa's oral motion for judgment of acquittal at the end of the government's case. Tr. 856:8-17.

Because Defendant Bolaji Bolarinwa is also a participant in the venture (*i.e.*, the marriage and its associated duties and responsibilities), and because Defendant Bolaji Bolarinwa obtained the labor or services of Victims 1 and 2 to the benefit of the venture (as opposed to obtaining the labor and services of Victims 1 and 2 ***solely*** for her own benefit in her individual capacity), that venture (through participant Defendant Bolaji Bolarinwa) obtained the labor and services of Victims 1 and 2 by prohibited means. Consistent with this Court's ruling on Defendant Bolaji Bolarinwa's oral motion for judgement of acquittal, the evidence presented at trial showed that Defendant Bolaji Bolarinwa obtained the labor and services of Victims 1 and 2 through prohibited means. Tr. 856:8-17.

### 3. Third Element: Knowing or in Reckless Disregard of the Means

Finally, the government must prove that Defendant Isiaka Bolarinwa knew or recklessly disregarded that the venture relied on prohibited means to obtain or provide the labor or services of Victim 1 or Victim 2. Reckless disregard is defined as indifference to a risk of which the defendant is aware. *See United States v. Johnstone*, 107 F.3d 200 n.11 (3d Cir. 1997); *see also United States v. Graham*, No. CR 14-623-1, 2020 WL 9596330, at *6 (E.D. Pa. Feb. 21, 2020) (finding that "reckless disregard of the facts" means deliberate indifference to facts which if considered and weighed in a reasonable manner indicate the highest probability that a person was involved in illegal actions); *United States v. Covington*, No. CR 19-636-6, 2021 WL 5769535, at *7 (E.D. Pa. Dec. 6, 2021), aff'd, (3d Cir. Mar. 8, 2023) (accepting definition of reckless disregard as "conscious indifference to the consequence of an act").

Here, the evidence shows that Defendant Isiaka Bolarinwa knew that the venture was engaged in forced labor because he observed Defendant Bolaji Bolarinwa's coercive conduct (*e.g.* he witnessed Defendant Bolaji Bolarinwa beating Victim 2 on at least one occasion, and he told her to stop, Tr. 643:14-24 (Victim 2's testimony); he monitored the phone conversations Victim 1 had in his home, Tr. 259:14-17 and Tr. 280:25-281:8 (Victim 1's testimony); he refused to let Victim 1 use his phone, Tr. 303:14-304:1; and he talked to Victim 2 about Defendant Bolaji Bolarinwa's mistreatment of her and told her that she needed to put up with the mistreatment in order to succeed in life, Tr. 565:19-657:19 (Victim 2's testimony). Defendant Isiaka Bolarinwa also slapped or hit Victim 2. Tr. 649:25-650:8 (Victim 2's testimony that Isiaka Bolarinwa slapped her face with his hand); Tr. 294:2-10 (Victim 1's testimony that Isiaka Bolarinwa hit Victim 2). These facts show, at minimum, that Defendant Isiaka Bolarinwa "consciously and carelessly ignored or disregarded[] many facts and circumstances [that] would have revealed that [Bolaji] was using, or would use, force, threats of force . . . or coercion to cause" Victim 1 and Victim 2 to engage in labor in his home. *See United States v. Spencer*, No. 21-CR-253-PP, 2024 WL 152609, at *7 (E.D. Wis. Jan. 14, 2024) (clarifying that to prove "reckless disregard" in an analogous sex trafficking case, the government must prove that during the relevant period, the defendant "consciously and carelessly ignored facts and circumstances that would reveal the fact that force, threats of force, fraud, coercion or a combination of those would be used to cause others to commit commercial sex acts"). The evidence showed that Defendant Isiaka Bolarinwa knew or recklessly disregarded that the venture obtained the labor or services of Victim 1 or Victim 2 through prohibited means.

C. **Count Five: Alien Harboring for Financial Gain In Violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i).**

This Court should likewise decline to disturb the jury's verdict with respect to Count Five because the evidence taken in the light most favorable to the United States permits the jury to have found the Defendant guilty beyond a reasonable doubt.

To prove alien harboring in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i), the government must prove the following elements beyond a reasonable doubt: (1) that Victim 1 was an alien; (2) that Victim 1 entered, came to, or remained in the United States in violation of law; (3) that Defendant Isiaka Bolarinwa concealed, harbored, or sheltered from detection Victim 1 within the United States; (4) that Defendant knew or acted in reckless disregard of that fact that Victim 1 entered, came to, or remained in the United States in violation of law; (5) that Defendant's conduct tended to substantially facilitate Victim 1 entering, coming to, or remaining in the United States illegally; and (6) that Defendants did so for private financial gain. *See* 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i); *see also United States v. Cuevas-Reyes*, 572 F.3d 119, 122 (3d Cir. 2009); *United States v. Frangos*, No. CRIM.A. 14-242, 2014 WL 4652473, at *3 (E.D. Pa. Sept. 18, 2014). In his Motion, Defendant only challenges the second and fourth elements, ECF 103 at 13. For the reasons set forth below, the evidence at trial is sufficient to support the jury's verdict.

1. **First Two Elements: Alien in Violation of Law**

Entering, coming, or remaining in the United States in violation of law satisfies this element of the offense. *See Cuevas-Reyes*, 572 F.3d at 120-21; *United States v. Ozcelik*, 527 F.3d 88, 98 (3d Cir. 2008); *United States v. Silveus*, 542 F.3d 993, 1003 (3d Cir. 2008). Overstaying a tourist visa qualifies as remaining in the United States illegally. *See Dann*, 652 F.3d at 1174-75 (finding that the defendant harbored an illegal immigrant who remained in the

United States past the expiration of the immigrant's tourist visa and did so for private financial gain).

Here, the evidence showed that Victim 1 unlawfully worked on her B-1/B-2 tourist visa. Tr. 240:20-241:21 (Victim 1 testified that she "worked" by taking care of the baby, doing the laundry, sweeping and mopping, and washing the toilets); 264:16-24 (Victim 1 testified that she cooked rice, beans, and food for the youngest two children); 525:16-526:1 (Jessica St. Petery observed Victim 1 cooking and cleaning the floors and testified that there was never a time that she saw Victim 1 in the Bolarinwa home when she was *not* working); 421:21-422:1 (Victim 1 was paid approximately $2,250 for the entire time she worked in the Bolarinwa home). The evidence also showed that Victim 1 overstayed her B-1/B-2 tourist visa. Tr. 789:10-14 (Andrea Whiting described how if an individual stays beyond the time they were permitted to stay at the port of entry they are out of status and unlawfully present in the United States); 792:7-17 and 793:20-23 (Andrea Whiting testified about how individuals with a B-1/B-2 visa cannot earn any money/income); Exhibit 118 (Victim 1's Non-Immigrant Visa Application); Exhibit 119 (Victim 1's DS-160 Form); Exhibit 122 (CBP Arrival and Departure Form). Therefore, Victim 1 was an alien, and remained in the United States in violation of the law after she overstayed her visa.

### 2.  Third Element: Harbor

The courts of appeal differ as to whether "harbor" simply means to shelter, *see e.g.*, *Dann*, 652 F.3d at 1172, or whether it requires more active concealment or shielding from detection, so as to "substantially facilitate the alien remaining in the United States illegally." *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013).  The Third Circuit has found the term "harbor" to mean something more than merely providing shelter but has expressed this requirement as an additional element – *i.e.*, the defendant's conduct tended to substantially facilitate the alien

22

remaining in the United States illegally. *See Ozcelik*, 527 F.3d at 99-100 (finding that "shielding," "harboring," and "concealing" encompasses conduct "tending to substantially facilitate an alien's remaining in the United States illegally" and to prevent government authorities from detecting the alien's unlawful presence.) As a result, the terms "concealing," "harboring," and "sheltering" should be given their ordinary meaning. Here, the evidence has shown that the Defendants provided shelter in their home for Victim 1 – *i.e.* there was no dispute at trial that Victim 1 lived in the Bolarinwa home between December 2015 and October 2016 – and substantially facilitated her remaining in the United States, *see infra*.

### 3. Fourth Element: Know or Recklessly Disregard

Regarding the fourth element, whether Defendant Isiaka Bolarinwa knew or recklessly disregarded Victim 1's illegal status, "[c]ircumstantial evidence alone can establish a defendant's knowledge or reckless disregard that the people harbored are illegally in the country." *De Jesus-Batres*, 410 F.3d 154, 161 (5th Cir. 2005) (citing *Rubio-Gonzalez*, 674 F.2d 1067, 1071 (5th Cir. 1982)); *see also Silveus*, 542 F.3d at 1004 (emphasizing that a "jury may use circumstantial evidence to support reasonable inferences of fact" in determining whether a defendant illegally harbored an alien, but that "mere speculation" is not enough).

Here, the evidence showed that the Defendant knew about Victim 1's illegal status because he had told Agent Vernon Addison that he knew Victim 1 was out of status. Tr. 630:15-25 (Agent Addison testified that Defendant Bolaji Bolarinwa told him that she knew Victim 1's visa was to expire in six months and that after six months she would be here illegally); 635:4-9 (Agent Addison testified that Defendant Isiaka Bolarinwa told him he knew Victim 1's visa would expire in six months).

### 4.   Fifth Element: Substantially Facilitate

Under this element, the government must prove that Defendant's conduct tended to "substantially facilitate [Victim 1's] remaining in the United States illegally and to prevent government authorities from detecting [their] unlawful presence." *See Cuevas-Reyes*, 572 F.3d at 122-23 (quoting *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir.2008)); *see also Ozcelik*, 527 F.3d at 1004. Taking steps to employ an illegal alien constitutes "substantially facilitating" the alien's ability to remain in the United States. Here, Defendant substantially facilitated Victim 1 by employing Victim 1 in his home. Moreover, Defendant Isiaka Bolarinwa substantially facilitated Victim 1 remaining in the United States by making her isolated and unable to interact with the outside world. Tr. 254:24-25 (Victim 1 testified that she did not have a driver's license); 257:23-25 (Victim 1 testified that she never had her own phone when she was in the Bolarinwa home); 258:1-259:25 (Victim 1 described how she was not permitted to place outgoing calls in the home and only received incoming calls from three people, and when she did receive calls, Defendant Bolaji Bolarinwa or Defendant Isiaka Bolarinwa would listen to the conversations on the extension); 261:2-4 (Victim 1 testified about how she experienced verbal abuse, had no freedom, and couldn't talk while she was in the Bolarinwa home); 268:10-22 (Victim 1 testified that she never spoke to the neighbors and never went out alone without the Bolarinwa's infant daughter); 269:10-20 (Victim 1 testified that she did not decide which church to attend and did not have any friends at the church the Defendant attended). Defendant Isiaka Bolarinwa also monitored Victim 1's communications with individuals outside of their home. Tr. 258:1-259:25 (Victim 1 described how she wasn't permitted to place outgoing calls in the home and only received incoming calls from three people, and when she did receive calls, Defendant Bolaji Bolarinwa or Defendant Isiaka Bolarinwa would listen to the conversations on the extension);

416:1-5 (Victim 1 testified about how she talked to Defendant Isiaka Bolarinwa about using the phone and he "walked away" in response).

Victim 1's sequestration, combined with her lack of possession of her passport and visa, effectively hid her from the outside world and made her detection from authorities less likely. *See, e.g.*, *Dann*, 652 F.3d at 1174 (finding that defendant restricted victim's movement "and forbade her from speaking to anyone outside the home" was sufficient evidence that the defendant was shielding the victim from detection); *United States v. Campbell*, 770 F.3d 556, 570 (7th Cir. 2014) (finding that defendant's efforts to profit from victims' labor "could be successful only if he were able to prevent law enforcement from detecting their illegal status and deporting them"); *United States v. Kim*, 193 F.3d 567, 574-75 (2d Cir.1999) (employer who required his illegal alien employee to obtain false documentation in order to mislead the INS and gave him detailed instructions regarding how to report falsely that he had been terminated from his job was guilty of substantial facilitation); *United States v. Sanchez*, 963 F.2d 152, 154–55 (8th Cir.1992) (providing illegal aliens with apartments and immigration papers justified a conviction for shielding, harboring, or concealing); *United States v. Rubio–Gonzalez*, 674 F.2d 1067, 1072–73 (5th Cir.1982) (upholding conviction for a foreman who had warned his illegal alien employees that INS agents were on site by speaking loudly and making gestures toward the INS agents to encourage the employees to flee the work facility).

### 5. Financial Gain

Finally, Defendant was motivated by private financial gain. Financial gain requires evidence that the defendants had the "goal of improving [their] economic status in one way or another." *United States v. Garcia*, 883 F.3d 570, 575 (5th Cir. 2018); *see also United States v. Zheng*, 306 F.3d 1080, 1085 (11th Cir. 2002). Courts have held that financial gain can be inferred

from financial purpose from certain circumstantial evidence and prospective gain. *See United States v. Li*, 615 F.3d 752, 756 (7th Cir. 2010) (holding that employer did not pay undocumented worker state mandated minimum wage shows financial gain to the employer). Additionally, courts have found that sufficient evidence of financial gain where defendants harbored an undocumented alien and the alien's "labor came at a significantly lower price than a comparable American housekeeper." *Calimlim*, 538 F.3d at 715.

Here, Defendant was motivated by financial gain because he did not pay Victim 1 a fair wage for their labor and services. Tr. 421:21-422:1 (Victim 1 was paid approximately $2,250 for the entire time she worked in the Bolarinwa home); 620:8-25 (Stipulation that from December 2015 until October 2016, the minimum wage rate in Moorestown, New Jersey, was $8.38 per hour); 622:7-626:16 (Agent Addison testified about the wages due to Victim 1 and Victim 2 using the minimum wage rate and various hours worked per day); Exhibit 300 (2016 Form 1040 Individual Tax Return for Defendants Isiaka and Bolaji Bolarinwa showing childcare tax credit).

### III.    CONCLUSION

For the reasons stated above, this Court should deny the Defendant Isiaka Bolarinwa's Renewed Motion for Judgment of Acquittal.

Dated: May 13, 2024                                  Respectfully submitted,

                                                     PHILIP R. SELLINGER
                                                     United States Attorney

                                                     */s/ Jeffrey Bender*
                                                     Jeffrey B. Bender
                                                     Assistant U.S. Attorney

                                                     */s/ Elizabeth A. Hutson*
                                                     Elizabeth A. Hutson
                                                     Civil Rights Division Trial Attorney